298 A.2d 788.

STATE *vs.* MICHAEL B. VACCARO.

JANUARY 19, 1973.

PRESENT: Roberts, C.J., Paolino, Powers, Joslin and Kelleher, JJ.

60

ROBERTS, C. J. This indictment charged the defendant, Michael B. Vaccaro, with the murder of Judith Dionne on Bodell Avenue in the city of Providence on June 26, 1970, at about 3 o'clock in the afternoon. The case was tried to a jury in the Superior Court, and the defendant was found guilty of murder in the first degree. His subsequent motion for a new trial was denied, and on February 23, 1971, he was sentenced to imprisonment for life. He is now in this court prosecuting his bill of exceptions.

The state produced eyewitness testimony of the shooting from two witnesses who lived at 9 Bodell Avenue, which was approximately the location at which the shooting occurred. Both of these witnesses identified defendant as the man who shot the victim, and both testified that they had known defendant for some time prior to the shooting. One such witness, Agnes Cannao, testified that she had seen defendant alight from a car he was driving and fire two shots at the victim. The other witness, Berla Walton, testified that she had seen defendant on Bodell Avenue at the time and that he walked from his car to the victim, stood over her, and fired a shot at her head. Mrs. Cannao further testified that as defendant was pulling away from the scene of the killing, the right front side of his car struck the rear lights and trunk of her car, a 1962 Comet. Mrs. Walton also had noted the registration number of the car in which defendant left, which was REGGY-1. She testified that she also saw defendant enter his car and drive off after the shooting.

## I

The defendant contends, first, that the trial justice erred in admitting into evidence Mrs. Walton's testimony regarding a statement made to her by her 15-year-old son, who did not himself testify. Mrs. Walton testified that about 3 o'clock on the afternoon of June 26 she was adjusting her television set. While so doing, she heard a scream and a noise that she thought was an exploding "salute." According to her testimony, she paid no attention to the noise until her son entered the house and said: "Ma, he is shooting Judy." She then testified that she ran to the window and looked out in time to observe defendant standing over the victim as he fired a shot at her head.

The defendant appears to argue that the statement of the witness's son was not admissible as part of the excited

utterance or spontaneous exclamation[1] exception to the hearsay exclusionary rule. First, we cannot agree that the testimony comes within the hearsay rule, for it was not offered for the purpose of establishing the truth of the fact asserted, that is, that defendant was doing the shooting. Rather, Mrs. Walton was simply relating the reasons that motivated her to go to the window and then to go outside.

However, assuming that her son's statement was hearsay, we cannot agree that it was error to admit her testimony under the spontaneous exclamation exception. The defendant argues in support of his contention that to come within this exception, the utterance must not only be of spontaneous origin, but it must also be contemporaneous with the event to which it refers. We cannot agree that the requirement of contemporaneousness so limits the admission of evidence under the spontaneous exclamation exception.

In this state we have never insisted on strict contemporaneity. Spontaneous exclamations may be admitted un-

---

[1] The trial justice and the briefs of counsel refer to this statement as part of the *res gestae*. In the history of the development of the hearsay rule, the phrase *res gestae* was used in two situations to avoid the application of the rule. First, statements which weren't hearsay at all were said to be admitted as part of the *res gestae*. Secondly, it was used to admit statements which now come within certain exceptions to the hearsay rule — declarations of present bodily condition, declarations of present mental states and emotions, excited utterances, and declarations of present sense impressions. Today, our understanding of the nature of the hearsay rule and the well-developed and clearly defined exceptions to the rule make possible and preferable more precise analysis and terminology in decisions related to the admissibility of evidence challenged as hearsay. Therefore, we adopt the suggestion that, "The ancient phrase can well be jetisoned, with due acknowledgment that it has served well its era in the evolution of evidence law." McCormick, *Evidence* §288, at 687 (2d ed. 1972). Henceforth, we shall attempt to be more precise and avoid the potentially confusing phrase "res gestae." In the case at hand, we interpret the reference to *res gestae* to be an attempt to admit the statement under the excited utterance or spontaneous exclamation exception to the hearsay rule.

der the excited utterance exception to the hearsay rule even if not strictly contemporaneous with the exciting cause if, from a consideration of all the facts in the case, it appears that the declarant, when he spoke, was still laboring under the stress of the nervous excitement engendered by the event he describes. *State* v. *Mancini,* 108 R. I. 261, 274 A.2d 742 (1971). This court has held that no specific lapse of time or distance from a scene of an incident can serve as a rule of thumb for a determination of when an utterance is excited or spontaneous. The test that must be applied is whether, under the facts of the particular case, the statements were spontaneous or impulsive or, on the other hand, were the product of reflection and deliberation. We have rejected any approach to the determination of what constitutes a spontaneous utterance strictly on the basis of the lapse of time which occurs between the incident and the utterance. "The crucial question is whether from a consideration of all the facts the trial justice is satisfied the declarant was still laboring under the stress of the nervous excitement when, as in this case, she spoke." *State* v. *Nordstrom,* 104 R. I. 471, 476, 244 A.2d 837, 840 (1968).

In the instant case it is clear that the boy made the statement after observing defendant shooting the victim. It appears from the record that the statement was made while the crime was still being committed. That the utterance was under the stress of nervous excitement is clear, and it is equally clear that there was no sufficient time for the youngster to deliberate or reflect upon what he saw. In the circumstances, we cannot say that the trial justice abused his discretion in concluding that the boy's statement was a spontaneous exclamation and, therefore, admissible as an exception to the hearsay rule.

## II

We turn to defendant's second contention of error. Regina Vaccaro, a daughter of defendant, during trial testified

as an alibi witness. According to her testimony, her father had been home all afternoon on the twenty-sixth and her car had been damaged while she was driving it on the previous day. For the purpose of rebutting this witness, the state called Donna Cagno. Donna's testimony contradicted the testimony of Regina. Donna, who was at the Vaccaro home between 2:45 and 3:15 on the afternoon of the murder, indicated that Regina told her that defendant was out around 3 o'clock that day. Donna further testified that Regina had told her that defendant returned home around 3:10 in the afternoon and that he had damaged Regina's car while he was out.

The defendant now urges that the court erred in admitting this testimony for impeachment purposes in that it was inadmissible hearsay. We cannot agree. It is well settled that prior inconsistent statements of a witness are admissible for the purpose of impeaching that witness. *Morgan* v. *Washington Trust Co.,* 105 R. I. 13, 249 A.2d 48 (1969); *State* v. *Brown,* 96 R. I. 236, 190 A.2d 725 (1963); *accord People* v. *DeKosta,* 132 Ill. App.2d 691, 270 N.E.2d 475 (1971).

The defendant in his brief intimates[2] that the court erred in admitting the impeaching testimony because the state failed to lay a proper foundation for that testimony when the prosecutor cross-examined Regina. The requirement of a proper foundation for such testimony is satisfied if the witness's attention is directed specifically to the time, the place, and the person to whom the supposed contradiction was made. Where a witness is to be impeached, a proper foundation must first be laid. This is accomplished by bringing to the witness's attention the circumstances under

---

[2] We use the word "intimates" because the issue of proper foundation was neither squarely raised to the judge below nor in the defendant's brief. Only a very broad reading of the brief might include the point. However, the state addressed the issue in its brief.

which the contradictory statements were made. *Aikins* v. *State*, 256 Ind. 671, 271 N.E.2d 418 (1971). The obvious purpose of the rule is to preclude surprise by requiring that the witness have an opportunity to explain the inconsistent statement. The application of the rule rests in the sound discretion of the trial justice, and so long as the witness understands what is being asked and is not misled, exact precision is not vital to the proper foundation. *State* v. *Caldwell*, 251 La. 780, 788, 206 So.2d 492, 495 (1968); *Carroll* v. *Pratt*, 247 Minn. 198, 203-04, 76 N.W.2d 693, 697-98 (1956).

Nowhere in the record or in the briefs was the issue of foundation discussed. Therefore, we must look to the cross-examination of Regina to ascertain if she was put on notice in regard to her contradictory statements to Donna Cagno. At page 327 of the transcript, the prosecutor asked Regina if she or Donna made any calls and, more specifically, a call to Donna's mother while she and Donna were at the Vaccaro home. These several questions properly served to notify Regina of the contrary evidence. Secondly, as to the issue of the damage to the car, Regina was asked at page 323 if her father had told her that he banged the car that day prior to her taking Donna home. Again, on page 328, she was asked if she had pointed out any damage on the automobile to Donna. To both questions she answered "no." Those questions were specific enough to prevent Regina from being misled or surprised by Donna's subsequent testimony.

## III

Lastly, defendant argues that the trial court erred in allowing into evidence opinion testimony adduced through an expert witness, Frederick Edwards. The testimony in question was the opinion of the expert as to the remoteness of the possibility that paint chips already in evidence could have come from more than one source. One of the

66

eyewitnesses to the shooting testified that as defendant was leaving the scene of the crime, the right front of his car struck the rear of her car. The state called an expert in spectographics to examine the paint chips from the right front of defendant's car and from the rear of the eyewitness's car. In so testifying, he stated that his conclusion was that certain paint chips (State's Exhibit 22) came from the same source as other paint chips (State's Exhibit 25). He further testified that the chips could have come "* * * from another source which was painted in a similar manner with matching paints, but this latter possibility was remote."

The defendant asserts that Mr. Edwards' opinion on the possibility of paint chips coming from a motor vehicle other than that of defendant was beyond the scope of his expertise and thus was prejudicially admitted into evidence. His contention is that such a statement is pure conjecture.

The law permits expert testimony in matters beyond the ordinary knowledge of the jury. If the witness possesses the necessary requisites with respect to education and experience, he is qualified to state his opinion regarding evidence from which the jury may need assistance in drawing inferences. However, such evidence has no special status, and the jury is free to accept, to reject, or to accord any amount of weight they choose to the expert's testimony.

In the instant case, after Mr. Edwards' qualifications were properly established, he outlined in great detail his examination of the two sets of paint chips. He recounted the scientific procedures, including microscopic, chemical, and physical analysis, which he employed. On the basis of these tests, he concluded that the chips came from the same source or from surfaces painted in a similar manner with matching paints, but that the latter possibility was remote. Achieving a meaningful conclusion from a collection of data obtained from spectographic tests is beyond

the ken of a jury. Experience, education, and scientific facts, not conjecture, produced Mr. Edwards' testimony. His conclusion offered two possibilities, one of which he considered very remote. The question objected to merely asked him to explain what he meant by remote. In answering, Mr. Edwards simply defined remote in a way comprehensible to the jury. His opinion, as an attempt to collate the data relating to the paint chips, was permissible since the jury was not capable of assessing those facts without expert assistance. Nevertheless, the jury was free to accept or reject his conclusion.

Mr. Edwards concluded that the great probability was that the paint chips were from the same source. In *State* v. *Andrews*, 86 R. I. 341, 134 A.2d 425 (1957), a doctor testified as to his opinion on the identity of hairs of the defendant and hairs found near the victim. The defendant's exception to the admission of this opinion evidence was overruled because the doctor's opinion was based on "microscopic comparison" of the hairs, which was "something he was better able to do than a jury." Moreover, in *United States* v. *Longfellow*, 406 F.2d 415 (4th Cir. 1969), and *State* v. *Hansen*, 199 Kan. 17, 427 P.2d 627 (1967), experts were allowed to testify that paint chips came from the same source. If, then, experts can assert that, in their opinion, scientific data indicates two specimens came from the same source, it should be permissible for an expert to state that it is highly probable that the specimens came from identical sources. *State* v. *Coolidge*, 109 N. H. 403, 422, 260 A.2d 547, 561 (1969), *rev'd on other grounds, Coolidge* v. *New Hampshire*, 403 U. S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Mr. Edwards' testimony was based on scientific facts as he viewed them. His testimony showed a high probability that the paint chips came from the same source. The testimony was thus properly admitted.

All of the defendant's exceptions are overruled, and the judgment of guilty is affirmed.

Petition for leave to reargue denied.

*Richard J. Israel,* Attorney General, *Donald P. Ryan,* Asst. Attorney General, *Raymond Greco,* Special Asst. Attorney General, for plaintiff.

*Harris Berson,* for defendant.