308 A.2d 828.

STATE *vs.* ALBERT CARRATURO.

AUGUST 14, 1973.

PRESENT: Roberts, C. J., Paolino, Kelleher and Doris, JJ.

PAOLINO, J. This indictment charged the defendant with the murder of Anthony Faria, in Bristol, on January 23,

1969. The case was heard before a justice of the Superior Court sitting with a jury and resulted in a verdict of guilty of second degree murder. After the denial of his motion for a new trial the defendant was sentenced to serve a sentence of 25 years, less time awaiting trial. He is now in this court prosecuting a bill of exceptions. The exceptions which he has briefed and argued relate to certain evidentiary rulings and to the charge to the jury.

The facts pertinent to the issues raised by the exceptions which defendant has briefed and argued are the following. On December 19, 1968, sometime between 1:10 and 1:15 a.m., Patrolmen Carl F. Ormond and Richard A. Marshall of the Bristol Police Department received a radio call to go to the Bristol County Medical Center because there had been a shooting, and a person had been shot. They went there and found the victim on a stretcher, bleeding. It had taken them four or five minutes to respond to the call. The victim's shirt was full of blood and he was conscious.

When Officers Ormond and Marshall went into the accident room, there were two custodians there. John Carraturo, brother of defendant, and Carlton Ingerson were in the doorway. Approximately three or four minutes after the two officers arrived at the accident room, a third officer, Patrolman Robert B. West, also arrived at the accident room. He too, while traveling alone, had received the call about 1 a.m. that a man had been shot and to respond to the Medical Center. It took him about three minutes to travel the distance from his location to the center. He noticed that the victim was bleeding from several parts of his body and began cutting off the victim's clothing. He found a puncture wound in the right side of the stomach, a wound on the left side of his chest, a wound on his left arm which was bleeding badly, and a puncture wound in the lower left back. He applied some first

aid to the victim by obtaining some surgical scissors from one of the drawers, cutting off the victim's clothing and, after looking for compress bandages, applying them to the victim.

The police cleared the room and then the victim told them that he had been at a certain cafe in Bristol and that defendant had shot him. As a result of the victim's statement, the Bristol Police made a search for defendant and later on found him in the back seat of an automobile in which Carlton Ingerson was a passenger and which was being operated by the latter's lady friend.

Albert Faria subsequently died as a result of the bullet wounds.

Carlton Ingerson testified that he was a co-owner of the cafe in which the shooting took place and was there about midnight of December 19, 1968; that defendant was also there; that he heard an argument in the rear of the cafe involving defendant, defendant's brother John, and Albert Faria; that he heard four shots and afterward saw Faria standing outside on the curbing; and that Faria showed him his wounds. John Carraturo testified about the difficulty with Faria and the shooting of Faria by his brother.

The defendant took the stand in his own defense. He admitted that he had shot Faria, but he claimed it was in self-defense.

## I

We consider first defendant's exceptions 1, 2 and 3, which were taken to the trial justice's rulings admitting, over defendant's objections, certain testimony by Officers Ormond, Marshall and West. The testimony objected to consisted of certain statements made by the victim to the police officers in the accident room at the medical center identifying defendant as the person who had shot him.

Officer Ormond was the first witness presented by the prosecution. After testifying that as a result of a radio

call to his car he and Officer Marshall responded to the medical center to investigate a shooting, he stated, in reply to questions by the prosecutor, that they removed everyone from the room except the police officers; that there was no doctor there at that time; and that after they cleared the room, they had a conversation with the victim. The prosecutor then asked the witness what the victim said at that time. The defendant's counsel objected to this question on the ground of hearsay, whereupon the prosecutor said this testimony was being offered as part of the *res gestae.* The trial justice overruled defendant's objection, holding that the testimony which the prosecutor was offering was admissible under our decisions in *State* v. *Bradshaw,* 101 R. I. 233, 221 A.2d 815 (1966); *State* v. *Nordstrom,* 104 R. I. 471, 244 A.2d 837 (1968). Officer Ormond then testified that the victim told them that he had been at the cafe in question and that defendant had shot him.

It appears from the transcript that the three police officers were present when the victim identified defendant as the person who shot him. It also appears that their testimony with respect to the statements made by the victim is substantially the same. In fact, defendant's counsel conceded in oral argument before us that if we affirmed the trial justice's ruling admitting Officer Ormond's testimony concerning the victim's statement, we need go no further because the testimony of the other two officers is merely cumulative. Accordingly, we shall treat only defendant's exception to the ruling overruling his objection to the question put to Officer Ormond. Our determination with respect to that exception will apply equally to the rulings admitting into evidence the testimony of the other two officers concerning the victim's statement that defendant had shot him.

The defendant does not quarrel with the rule as set

forth in *Bradshaw* and *Nordstrom*, both *supra*. However, he argues that the case at bar is distinguishable from those cases because the state presented no testimony, prior to the testimony of the officers, showing any facts which could lead the trial justice to believe that this was part of the *res gestae*. Specifically, he contends that there is no testimony to show whether or not these were the instinctive and spontaneous utterances of the victim and whether or not the victim's statement was so closely connected with the incident and made under such circumstances as clearly to indicate that there was neither any prior reflection nor any prior deliberations as to what was being said. We find no merit to any of the claims made by defendant on this issue.

The rule governing the admissibility of testimony in a situation such as this has been stated many times. *State* v. *Bradshaw, State* v. *Nordstrom*, both *supra*. We considered this question again only recently in *State* v. *Vaccaro*, 111 R. I. 59, 298 A.2d 788 (1973), where we pointed out that the use of the term *res gestae* was to be avoided and that from thenceforth we would attempt to be more precise and avoid the potentially confusing phrase *"res gestae." Id.* at 62 n.1, 298 A.2d at 790 n.1. We also noted that in that case we interpreted the reference to *res gestae* to be an attempt to admit the statement under the excited utterance or spontaneous exclamation exception to the hearsay rule, which we explained as follows:

> "In this state we have never insisted on strict contemporaneity. Spontaneous exclamations may be admitted under the excited utterance exception to the hearsay rule even if not strictly contemporaneous with the exciting cause if, from a consideration of all the facts in the case, it appears that the declarant, when he spoke, was still laboring under the stress of the nervous excitement engendered by the event he describes. *State* v. *Mancini*, 108 R. I. 261, 274 A.2d 742 (1971). This court has held that no specific

lapse of time or distance from a scene of an incident can serve as a rule of thumb for a determination of when an utterance is excited or spontaneous. The test that must be applied is whether, under the facts of the particular case, the statements were spontaneous or impulsive or, on the other hand, were the product of reflection and deliberation. We have rejected any approach to the determination of what constitutes a spontaneous utterance strictly on the basis of the lapse of time which occurs between the incident and the utterance. 'The crucial question is whether from a consideration of all the facts the trial justice is satisfied the declarant was still laboring under the stress of the nervous excitement when, as in this case, she spoke.' *State* v. *Nordstrom,* 104 R. I. 471, 476, 244 A.2d 837, 840 (1968)." *Id.* at 62-63, 298 A.2d at 790.

In the case at bar we shall also treat the reference to *res gestate* as an attempt to admit the statement under the excited utterance or spontaneous exclamation exception to the hearsay rule. The trial justice had to decide on the basis of the testimony presented by Officer Ormond whether the statements were spontaneous or impulsive or, on the other hand, whether they were the product of reflection and deliberation, and whether the victim was still laboring under the stress of nervous excitement. In the circumstances present in the accident room at the time, and in view of the victim's physical condition as described above, we cannot say that the trial justice abused his discretion in concluding that the victim's statement was a spontaneous exclamation and, therefore, admissible as an exception to the hearsay rule. We are satisfied that the testimony before the trial justice at the time of Officer Ormond's testimony was sufficient for him to conclude that the statement of the victim was a spontaneous or excited utterance.

## II

We next consider exception 4. Carlton Ingerson was the first witness called by defendant after the state rested. He testified, while being cross-examined by the prosecutor, that after he left the medical center on the night in question, he went back to his cafe with defendant's brother, John; that when he got to the cafe defendant was there and asked him for a ride home; that defendant got into the back seat; that on the way to defendant's home he was stopped by police officers and asked if he knew where defendant was; that he replied that he did not know. Then the following questioning took place:

"428  Q  Where was the defendant Beetles Carraturo at this time?

A  In the back seat.

"429  Q  Was he sitting?

A  Laying down.

"430  Q  He was laying down. It was apparent to you at that time that he was hiding?

A  Yes.

"431  Q  Now —

Mr. Berretto:  Objection.

The Court:  He's answered the question.

Mr. Berretto:  I move the answer be stricken."

The trial justice denied defendant's motion to strike and noted his exception.

The defendant contends that the trial justice erred in denying his motion to strike, but the brief contains no argument in support of defendant's claim of error, other than the bare assertion that

"Defendant feels that the use of the word 'hiding' in the State's question was an improper characterization of the facts and called for a conclusion on the

part of the witness and for that reason the question and answer should have been stricken."

The defendant did not elaborate on this statement during his oral argument. In the circumstances it is clear that this exception, having been neither briefed nor argued in accordance with our rules, is, at least for the purposes of this case, deemed to be waived. *State* v. *Carufel,* 106 R. I. 739, 742, 263 A.2d 686, 687-88 (1970).

### III

The defendant's exception 5 was taken to the trial justice's denial of a request by defendant for a voir dire hearing about a statement made by John Carraturo to the Bristol police at 9 a.m. on the morning of December 19, 1968. It appears from the transcript that the prosecutor was using this statement during his cross-examination of John Carraturo, who was presented as a witness for defendant, to impeach John's testimony. After the prosecutor asked some preliminary questions about the statement in question, defendant's counsel interposed an objection and requested a voir dire hearing on the statement, saying that he would like to determine whether or not the witness had been advised of any of his rights.

After noting that there was nothing to indicate that the witness was in custody or was being interrogated while in custody, and that the statement was being used for impeachment purposes only, the trial justice overruled defendant's objection and denied his request for a voir dire hearing.

The defendant cites no authority for his claim that the trial justice erred. He merely states that the Bristol police were aware of the fact that John Carraturo had brought the victim to the medical center and that there was a "distinct possibility that John Carraturo could have been charged with misprison of a felony, or conspiracy, or being an accessory after the fact * * *." He then argues that

the defense should have been permitted to examine on a voir dire the circumstances under which the statement was taken for the purpose of determining whether or not it was properly taken. He further argues that the rights afforded a defendant under *Miranda* v. *Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Escobedo* v. *Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); and *State* v. *Mendes,* 99 R. I. 606, 210 A.2d 50 (1965), should also be afforded to persons in the witness's situation.

On the basis of the record before us we find no merit to any of defendant's arguments on this issue. The cases cited by him apply to statements made by a defendant in custody. John Carraturo was a witness, not a defendant. He was not in custody when he made the statement which is the subject of defendant's instant exception. The record shows that he went to the police station and made the statement.

If defendant is arguing that he was entitled to a preliminary hearing in the absence of the jury to determine the voluntariness of the witness's statement, he has cited no authority, nor have we found any, which holds that a voir dire hearing must be held to test the voluntariness of a witness's statement when such a statement is used to impeach him.

### IV

The defendant's exceptions 6 and 7 were taken to the overruling of two objections made by defendant during the state's cross-examination of defendant which appeared in the transcript as follows:

"390  Q  And when the police stopped the automobile on State Street you were lying in the back seat, isn't that so?

&ast; &ast; &ast;

"396  Q  So you were hiding at that time?"

The trial justice overruled defendant's objections to these questions. The defendant contends that question 390 is objectionable because it was outside the scope of direct examination and that question 396 is objectionable for the same reason and, in addition, because the question called for a conclusion.

We find no merit to either exception. The scope of cross-examination is within the discretion of the trial justice and his exercise thereof will not be disturbed except for clear abuse, and only when such abuse works to the prejudice of the objecting party. *State* v. *Jamgochian,* 109 R. I. 46, 280 A.2d 320 (1971); *Goldis* v. *Fairchild,* 103 R. I. 746, 241 A.2d 298 (1968). In the case at bar the fact that defendant had been lying on the back seat of the automobile when he was arrested was brought out by at least two witnesses, without objection, prior to the time when questions 390 and 396 were asked of defendant. In the circumstances we fail to see how defendant could be prejudiced by the questions which are the subject of these exceptions.

## V

The defendant's final contention is that the trial justice erred in his charge to the jury by his instruction concerning flight from or concealment of a crime and in not defining flight. The defendant refers specifically to the following portion of the charge:

> "If you find evidence of flight from the scene of the crime here, or concealment of a crime, you may consider that as evidence of consciousness of guilt. Here again, this is the drawing of an inference from facts that are established, if you wish to draw the inference. I'm not saying you have to. Whether you do or whether you do not depends altogether on how you view the evidence. It depends also on what inferences you think should fairly be drawn."

None of the authorities cited by defendant establish that

190

the trial justice's instruction concerning flight is erroneous and, therefore, we refrain from any further reference to them. There is evidence in the record that after the incident at the cafe defendant left the place and was later apprehended by the police, who found him lying down in the back of an automobile. The instruction as given is substantially similar to the rule set forth in *State* v. *Papa*, 32 R. I. 453, 461, 80 A. 12, 16 (1911), where the court said:

> "There is no question but that evidence of the conduct of the defendant subsequent to the commission of an offence is always admissible; hence evidence of his flight is competent on the question of his guilt. It is a circumstance which the jury are entitled to consider as an indication of the consciousness of guilt on the part of the defendant. * * * However, it is the province of the jury to determine the weight of this species of evidence."

In the case at bar the trial justice expressly pointed out that if the jury found evidence of flight from the scene of the crime, they could consider that as evidence of consciousness of guilt. He also pointed out that this conclusion involved the drawing of an inference from facts that were established, but he made it clear that this was a matter for them to decide. Since defendant admitted he shot the victim but asserted that it was in self-defense, the question of flight was relevant to the ultimate issue before the jury.

With respect to the trial justice's reference to "concealment of a crime" defendant argues that since there is no evidence of the concealment of a crime, the phrase "concealment of a crime" should not have been used. We agree with defendant that the trial justice

> "* * * actually meant concealment of the defendant in regard to 'flight' in order to make the charge reflect the element of concealment of the defendant which is contained in some of the definitions of 'flight' * * *."

In the circumstances it is true that it was error to include the phrase in question, but the question remains whether the jury was misled thereby to the prejudice of defendant. As we pointed out in *State* v. *Sliney,* 101 R. I. 423, 427, 224 A.2d 603, 605 (1966), a challenged statement in a charge must not be read in a vacuum; it must be read in the context of the charge as a whole. The trial justice was explaining to the jury the inference they could draw from the established facts. We are satisfied from a reading of the portion of the charge in question that in the context in which the challenged language was uttered, this is the meaning which it would reasonably convey to the jury. *State* v. *Moore,* 106 R. I. 92, 103, 256 A.2d 197, 203 (1969). We are satisfied that the jury was not misled by the challenged phrase and that defendant was not adversely prejudiced thereby.

The defendant's final contention that the trial justice erred in not defining the word "flight" before the jury is without merit. The defendant did not object to the charge on the ground that "flight" was not defined and he fails to point out wherein he asked for any instructions on this question. If the defendant felt that there was a necessity for instructions as to the meaning of the word "flight," it was incumbent on him to ask for the same. *State* v. *Amado,* 109 R. I. 53, 58, 280 A.2d 324, 327 (1971).

All of the exceptions which defendant has briefed and argued are overruled, those neither briefed nor argued are deemed to be waived, and the case is remitted to the Superior Court for further proceedings.

Mr. Justice Joslin did not participate.

*Richard J. Israel,* Attorney General, *Donald P. Ryan,* Asst. Attorney General, for plaintiff.

*Anthony R. Berretto,* for defendant.