373 A.2d 162.

STATE *vs.* WILLIAM K. EARLEY AND CHARLES TUZ.

MAY 10, 1977.

PRESENT: Bevilacqua, C.J., Paolino, Joslin, Kelleher and Doris, JJ.

KELLEHER, J. In November 1974, a Newport grand jury returned two indictments. One charged the defendant, William K. Farley, and the other charged the defendant, Charles Tuz, with having assaulted one Ralph O'Neil with a dangerous weapon. Later, in June 1975, a Superior Court jury found the defendants guilty as charged. In this appeal they challenge several evidentiary rulings made by the trial justice. Hereinafter we will refer to the defendants by their last names.

One of the witnesses for the prosecution was Daniel Jackson. In exchange for a promise of immunity, Jackson testified that during the afternoon of August 25, 1974, Earley had offered him $20 if later on in that day Jackson would go to the Vernon Avenue house of Ralph O'Neill, knock on the front door, and tell whoever answered that someone was tampering with O'Neil's car.

While Jackson was at the front door, Earley and Tuz were to be nearby. Each would be disguised and armed with an axe handle. Earley and Tuz were to put the wood to O'Neil once he appeared near the car.

Jackson kept his part of the bargain. At 9:30 p.m. he knocked on the door and told Mrs. O'Neil that someone was trying to break into her car. Mr. O'Neil overheard the conversation, and he, with a broom handle and flashlight in hand, went out to evaluate the situation. According to Mrs. O'Neil, the two masked men appeared from behind a nearby hedge and attacked her husband with what were later described as axe handles. While O'Neil was attempting to fend off his assailants with the broom handle, Mrs. O'Neil called the police. Jackson, in the meantime, had made a hasty retreat to the trio's getaway car. The struggle was brief, and Mr. O'Neil returned home shaken but, happily, with only a sizeable welt on his leg.

Frederick Glynn is a Newport police officer. On the night in question he was on duty assigned to Cruiser 3. While responding to a radio message to proceed to Vernon Avenue, he observed Earley's vehicle heading in the opposite direction. He noticed that two of its occupants fitted the description he had just heard. The officer pursued and overtook Earley's automobile and arrested Earley, Tuz, and Jackson. The arrest took place about three blocks away from the O'Neil residence.

Later on in the evening, one of the O'Neils' neighbors informed the police that he had observed a car parked across the street from his house near the time of the incident. The neighbor reported that his suspicions were aroused because he saw three people leave the vehicle and travel through a nearby empty lot. About 10 or 15 minutes later one individual returned to the car. Minutes

later two others came running through the lot, jumped into the car, and the vehicle sped away.

A search of the lot, which took place that evening and the following day, uncovered a black watch cap; a white and blue ski mask; an axe handle, and a jacket. These items were discovered at a point halfway between the O'Neil residence and the place where the arrest occurred.

The defendants denied any participation in the assault. Their defense included an alibi which indicated that at the time of the assault defendants were driving in and about various streets of Newport and nearby Middletown. They claim that, moments before the arrest, they had stopped and picked up Jackson, who had been hitchhiking. One of the defense witnesses, a Paul Desrosiers, insisted that Jackson had told him that he had confessed to the police because he was scared and didn't have a lawyer. Another defense witness was a former girlfriend of Jackson's. We shall allude to her testimony later in this opinion.

The first witness at the trial was a special agent for the Federal Bureau of Investigation (FBI). He first described to the jury the various microscopic examinations and comparisons he had made between hairs found in the ski mask and test specimens taken from Earley's hair. The thrust of this witness' testimony was that his analysis and study had disclosed that there was a reasonable probability that the hair found in the ski mask belonged to Earley.

The defense argues that the expert's testimony should have been excluded because at the time he testified, the prosecution had failed to establish the requisite chain of custody indicating the travel of the mask and the hair specimens from Earley to the Newport police to the FBI's laboratory. As was pointed out earlier, the agent was the

first witness for the prosecution. The record indicates that the trial was a day late in starting and the agent had a commitment which required his presence in another jurisdiction. In permitting the agent to appear out of time, the trial justice made it clear that the agent's testimony would be subject to any subsequent motion to strike. Later in the trial, members of the Newport Police Department testified and established the requisite chain of custody.

The order of proof rests within the sound discretion of the trial justice. He may admit competent evidence at any stage of the trial. *State* v. *Mattatall,* 114 R.I. 568, 337 A.2d 229 (1975); *Vigneau* v. *La Salle,* 111 R.I. 179, 300 A.2d 477 (1973). Given the time factors involved here as well as the safeguard of a reserved motion to strike the testimony, we cannot fault the trial justice for having permitted the agent to testify out of turn.

The defendants' second argument relates to their contention that the special agent should not have been permitted to draw conclusions from his comparison of the hair samples. The rule in this state is well-established that whether or not a witness shall be permitted to testify as an expert is within the sound discretion of the trial justice. *State* v. *Camerlin,* 117 R.I. 61, 362 A.2d 759 (1976); *State* v. *Capone,* 115 R.I. 426, 347 A.2d 615 (1975); *State* v. *Cochrane,* 114 R.I. 710, 339 A.2d 256 (1975). In earlier cases we have specifically allowed an expert to give his opinion that a microscopic examination of hairs or fibers found near the victim and those taken from the defendant originated from the same source. *State* v. *Jefferson,* 116 R.I. 124, 353 A.2d 190 (1976); *State* v. *Andrews,* 86 R.I. 341, 134 A.2d 425, *cert. denied,* 355 U.S. 898, 78 S.Ct. 274, 2 L.Ed.2d 195 (1957). The jury, of course, is free to reject, accept, or attach any amount of weight it desires to the expert's testimony. *State* v. *Vaccaro,* 111 R.I. 59, 298 A.2d 788 (1973). With

these guidelines in mind, we cannot fault the trial justice's finding that the special agent was an expert and his ensuing testimony would assist the jury in determining defendants' guilt or innocence.

The defendants next contend that the ski mask, axe handle, and ski jacket should not have been admitted into evidence. They contend there is no evidence showing that they were either in possession of, or owned, these items. We have held that physical evidence is properly admissible where there is "a probability that the proffered evidence was connected with the crime." *State* v. *Kieon,* 93 R.I. 290, 293, 175 A.2d 284, 286 (1961). Again, the weight to be attached to such evidence is left to the jury. Both the O'Neils and Jackson testified that these items were or looked the same as those used during the attack. They were all found at the same location and were just a block and a half away from the O'Neil residence. We find no error in their admission into evidence.

Both Earley and Tuz took the stand. Earley testified first, and during his cross-examination the state embarked upon an inquiry into his past criminal convictions. At that point the trial court told the jury that the sole purpose of presenting evidence as to prior convictions was to impeach a witness' veracity and that the convictions had no bearing whatever on the pending question of defendant's guilt or innocence.

Later, when Tuz testified in direct testimony, he told the jury that he was presently living at the state's prison. During cross-examination he was asked if the reason for his present address was due to the fact that he had previously pleaded nolo to a charge of breaking and entering. The defense lodged an objection but gave no reasons for its action. The trial justice, in overruling the objection,

remarked that he overruled the objection "in view of questions that have been asked previously."

In pressing the objection before us, the defense takes the position that the trial justice could not rely on the general admonition he gave to the jury when the prosecution first inquired into Earley's criminal career but that in cases involving more than one defendant, the trial court must give the required admonition every time an attempt is made to impeach any defendant who wishes to testify. In support of this proposition Tuz refers us to certain language found in *State* v. *Lombardi*, 113 R.I. 206, 209, 319 A.2d 346, 347 (1974), where reference is made to this court's insistence that the jury be told of the purpose of prior convictions "at the time it is received in evidence." If we assume that *Lombardi* stands for the proposition now asserted by Tuz, such an assumption affords him little comfort. A defendant who testifies in his own behalf must expect to be cross-examined on matters to which he testified on direct examination. Once Tuz in his direct testimony gave his present address as the state prison, the state was entitled to inquire as to what he was doing there. *See State* v. *Rogers*, 324 So.2d 403 (La. 1975). The door having been opened, the state could make it clear why Tuz was living at the Adult Correctional Institutions.

When Jackson was being cross-examined, defense counsel asked him if he could recall having a conversation about this case with his former girlfriend, Donna. Jackson gave a negative reply. There then followed a series of questions, each of which asked the witness if he remembered talking to the girlfriend about the case. The state's objections to this line of inquiry were sustained, and the defense now claims that it was barred from using Jackson's prior inconsistent statement to impeach his credibility. We have said that as a general rule evidence of al-

leged prior inconsistent statements will be introduced into evidence only after a proper foundation has been made. In laying the foundation, it is necessary that the witness' attention first be directed to the nature of the supposed statements and when, where, and to whom they were made. *State* v. *Bowden,* 113 R.I. 649, 324 A.2d 631 (1974); *State* v. *Vaccaro, supra.* At no time when these inquiries were being posed did the defense ever attempt to enlighten the court or the witness as to just what was the exact nature of the alleged conversational exchange between Jackson and Donna. When a purported inconsistent statement by a witness is offered, the trial court must determine whether such statement is in fact inconsistent with the witness' testimony. *Morgan* v. *Washington Trust Co.,* 105 R.I. 13, 249 A.2d 48 (1969). Consequently, whether the proper foundation has been laid is a question directed to the trial justice's sound discretion. Here, since the necessary evidentiary bricks and mortar were never put in place, we cannot fault the trial justice for sustaining the state's objections.

Parenthetically, we would point out that subsequent to Jackson's testimony Donna, the girlfriend, took the stand and told the jury that she and Jackson lived together during the fall of 1974. Donna related how, on an evening just a week before the couple "split up," when she and Jackson were having a few beers and watching television, she had asked Jackson if he still had to go to court. According to Donna, Jackson "put his head down, and all he said was he lied about Geech and Chuck." ("Geech" is Earley and "Chuck" is Tuz.)

Once the defense had rested, Jackson returned to the stand as a rebuttal witness. He denied having told Donna that he had lied to the police. Rather, he claimed that when he told her of his fear of defendants, Donna assured him that she "had friends down the Fifth Ward that could

take care of them if he [Earley] threatened him." Jackson also told the jury that the assault trial had been scheduled to begin 2 months earlier on April 14, 1975, but his testimony had had to be postponed until the afternoon. During a lunch hour break on April 14, Jackson left the Newport County Courthouse, took an automobile ride to the airport in Warwick, and boarded a plane which ultimately landed him somewhere south of the Mason-Dixon line. Thereafter, Jackson visited with some relatives. He attributed his speedy and somewhat unexpected exit to the fact that as he was leaving the courthouse, he met Paul Desrosiers, who advised Jackson that his life and his mother's life would be in jeopardy if he returned that afternoon to testify for the state.

Two letters were introduced in evidence. One was from Desrosiers to Jackson. It was sent after the police had interrupted Jackson's southern visitation and returned him to the more secure confines of the Adult Correctional Institutions. In it Desrosiers tells Jackson to "stand strong. You have a friend with me. * * * Think. These people are using you and it won't stop here." Desrosiers invited Jackson to write or telephone. In response, Jackson wrote to Desrosiers and told him that he didn't know who turned him in but that it certainly "mess[ed] things up" and if Desrosiers wanted to be a true friend, he could see to it that Jackson had a good lawyer who would "stand by me in court."

During his direct testimony, Jackson had mentioned that on April 14 he had spent most of the morning in an area of the Newport Couty Courthouse that is reserved for the Department of the Attorney General, talking to staff members and the police who were working on the case. Somewhere in the cross-examination the defense inquired about Jackson's activities on the morning of April 14. He said that he had been served a subpoena and that

he then spent the next hour and a half in the Department of the Attorney General, speaking to those who were involved in this case. At that point defense counsel asked: "You weren't in protective custody then, were you?" The state objected, and the objection was sustained apparently on the ground of relevance. This action presents us with defendants' final claim of error.

Before us the defendants claim that if they could have elicited an affirmative answer to this inquiry, they could have shown that in return for his testimony Jackson expected favorable treatment from the state regarding his "escape." Initially, we would point out that one who escapes from protective custody is not liable under any criminal statute. If an individual wants to leave protective custody and go it alone, that is his business. Simply stated, there are no criminal sanctions by which he can be punished for making such a choice. By taking off for parts unknown, Jackson disobeyed a subpoena and could conceivably have been subject to a contempt proceeding. Whether such action was contemplated is really of no moment considering the real issue before us. It is clear that the question about protective custody was ambiguous and totally irrelevant at the time it was asked. The trial justice quite properly sustained the state's objection.

In each case the defendant's appeal is denied and dismissed and the judgment of conviction is affirmed, and the cases are remitted to the Superior Court.

*Julius C. Michaelson*, Attorney General, *Nancy Marks Rahmes*, Special Asst. Attorney General, for plaintiff.

*Ralph D. Morrison*, for defendants.