STATE

v.

**Ronald DAME.**

No. 84–29–C.A.

Supreme Court of Rhode Island.

Feb. 20, 1985.

Dennis J. Roberts II, Atty. Gen., Charles Nystedt, Sp. Asst. Atty. Gen., Providence, for plaintiff.

William F. Reilly, Public Defender, Barbara Hurst, Asst. Public Defender, Chief of Appellate Div., Paula Rosin, Asst. Public Defender, Providence, for defendant.

## OPINION

WEISBERGER, Justice.

This case comes before us on appeal from a judgment of conviction entered in the Superior Court upon an indictment charging the defendant with first-degree arson, death resulting, in violation of G.L. 1956 (1981 Reenactment) § 11-4-2. We reverse and order a new trial. The facts disclosed by evidence introduced at the trial were as follows.

On July 10, 1981, a multiple family dwelling located at 70 Cottage Street in the city of Central Falls was substantially destroyed by fire. A resident of the building, Henrietta Corneau (Corneau), died as a result of the fire. The defendant, Ronald Dame (Dame), was subsequently indicted on the ground that he intentionally set fire to the building, thereby causing Corneau's death.

At approximately 11:15 p.m. on July 9, 1981, Jacqueline Prefontaine (Prefontaine) drove to the front of the apartment building located at 70 Cottage Street where she was a tenant. She saw Dame sitting on the front steps of the building. Prefontaine and Dame had known each other for a number of years and had had a lengthy romantic relationship. They had lived together for a period of seven years, had broken off the relationship for a period of

time, and had then resumed it just prior to the fire. Prefontaine approached Dame and informed him that she was going out for a drink with an old friend, Jeremiah O'Connor (O'Connor), who was at that time an off-duty Central Falls police officer. Prefontaine gave Dame the keys to her apartment, told him that she would return in an hour or so, and suggested that he go to her apartment and wait for her. Prefontaine then left with O'Connor.

Prefontaine and O'Connor returned to the apartment more than an hour later at about 12:40 a.m. and noted that the building was on fire. At the same time they saw Dame outside the burning building. Dame later told Prefontaine that he had gone into the apartment, had drunk a beer, had smoked a cigarette in the kitchen, and had then proceeded to the bedroom where he lit candles and then fell asleep on the bed. Apparently Prefontaine kept numerous candles in candle holders on the headboard of her bed. Dame awoke to find the bedroom in flames. He later told an investigator, John Fiore of the State Fire Marshal's Office, that he awoke to heat and smoke and saw flames going up the wall and rolling over the ceiling. He then grabbed his shirt, shoes, and two sets of keys and fled the building.

Firefighters from the Central Falls Fire Department arrived at the scene of the fire at about 12:45 a.m. Lieutenant Rene Coutu (Coutu) of the fire department attempted to rescue Corneau, who was trapped in her second floor apartment. During the rescue attempt, a back draft explosion occurred projecting fifteen to twenty feet of flame out Corneau's window and blowing Coutu off the ladder. Corneau's body was removed from the building at approximately 2:30 a.m.

In support of his appeal, Dame raises four issues. These issues will be considered in the order of their significance to our opinion. Additional facts will be supplied as may be necessary to place these issues in appropriate context.

I

DID THE TRIAL JUSTICE COMMIT REVERSIBLE ERROR IN HER RESPONSE TO A REQUEST FROM THE JURY CONCERNING INFORMATION REGARDING BATTALION CHIEF FELBER'S TESTIMONY?

The theory of the defense derived from statements given by Dame following the fire was that Dame did not start this fire deliberately. Defense counsel argued to the jury that the fire was accidental in origin. The theory of the state was that the fire was incendiary in origin; that it had been started deliberately by Dame, who then fled the building. Dame's statement suggested that when he awoke and found the bedroom on fire, he hurriedly left the room and went outside with the intention of calling the fire department but, upon his exiting the building, met Prefontaine and O'Connor. It is undisputed that the fire department received a call at 12:43 a.m. and responded to the fire by 12:45 a.m. The time of the commencement of the fire was crucial to the state's case. The state sought to show that Dame could not have left the bedroom immediately prior to the arrival of Prefontaine and O'Connor at 12:40 a.m., because the fire was too far advanced at that time to permit his leaving the building without serious injury from the heat and smoke.

At trial Battalion Chief Robert Felber (Felber) of the Central Falls Fire Department was qualified by the trial justice to testify as an expert witness. Consequently, he was permitted to give opinion testimony in respect to the approximate time of the beginning of the fire. On direct examination, Felber testified that in his opinion, based upon a number of factors, the fire had started at approximately 12:15 a.m. On cross-examination, however, defense counsel sought to elicit from the witness testimony that the fire could have started later than 12:15 a.m. Defense counsel also suggested in his final argument that the

fire may have commenced at about 12:30 a.m. or later.

As previously indicated, this evidence was crucial to the determination of Dame's guilt or innocence. The earlier the fire began, the more likely it was that Dame had ignited the fire and then left the building. On the other hand, the later the fire started, the more likely it was that Dame did awake to smoke and flames and flee the building at just about the same time that Prefontaine and O'Connor arrived at the scene. About four hours after the jury began its deliberations, the foreman sent a note to the trial justice requesting information with regard to Felber's testimony that indicated the approximate time of the start of the fire. Defense counsel had requested that the trial justice read to the jury both Felber's direct testimony and his cross-examination relating to this issue. In response to the jurors' request, however, the trial justice made the following statement:

"I will read the note into the record.

"The jury requests information with regard to Battalion Chief Felber's testimony, which indicated the approximate time of the start of the fire. I have examined my notes, I take notes, and I think I can rely on them in this regard. Rather than have our Court Reporter read back Chief Felber's testimony, I read my notes.

"When Battalion Chief Felber was on direct examination, that is to say, when he was being asked questions by the prosecuting attorney, he offered his opinion that the fire started about half an hour before he arrived on the scene at twelve forty-five a.m."

In response to defense counsel's argument that the testimony on cross-examination would bear the interpretation that the fire had started at about 12:30 a.m., the trial justice made the following response:

"My interpretation may be incorrect, and I know you did argue to the jury that his words, that he came to this conclusion at one o'clock, meant that the fire had started at twelve-thirty. You may be right,

but in any event, you are protected on the record."

■ In a jury trial, it is exclusively the province of the jury to determine the weight and credibility to be given to the testimony of each witness. *State v. Aptt*, R.I., 441 A.2d 824, 829 (1982); *State v. Goff*, 107 R.I. 331, 339, 267 A.2d 686, 690 (1970); *State v. Harris*, 89 R.I. 202, 209–10, 152 A.2d 106, 110–11 (1959). It is well settled by this court, therefore, that a trial justice's comments upon the evidence, if made in the presence of the jury, must be "completely impartial," *State v. Holland*, 122 R.I. 339, 347, 405 A.2d 1211, 1216 (1979); *State v. Harris*, 89 R.I. at 209, 152 A.2d at 110; *Miller v. Bessette*, 80 R.I. 187, 191, 94 A.2d 253, 255–56 (1953); *State v. Douglas*, 78 R.I. 60, 66–67, 78 A.2d 850, 853–54 (1951); *State v. Lynott*, 5 R.I. 295 (1858), otherwise such a comment might result in a "clear invasion of the province of the jury." *State v. Aptt*, 441 A.2d at 829; *State v. Pella*, 101 R.I. 62, 70, 220 A.2d 226, 231 (1966).

■ Although it has been stated that it is within the discretion of a trial justice to have testimony read back to the jury in the event of a request for clarification of a factual issue, *Stone v. United States*, 506 F.2d 561, 564 (8th Cir.1974), *cert. denied*, 420 U.S. 978, 95 S.Ct. 1405, 43 L.Ed.2d 659 (1975); *Pinckney v. United States*, 352 F.2d 69, 70 (5th Cir.1965), we have indicated that a request from a jury to read back testimony should probably be honored. *State v. Sciarra*, R.I., 448 A.2d 1215, 1220 (1982). In the event that a trial justice attempts to summarize evidence either in the context of responding to a request or in giving instructions, that summary must be accurate and impartial. *State v. Holland*, 122 R.I. at 347, 405 A.2d at 1216; *see* G.L.1956 (1969 Reenactment) § 8-2-38.

■ Although the trial justice does have a great deal of discretion in this area, if he or she chooses to summarize the testimony to the jury, then certain requirements must

be met. First, the summary must be completely accurate. *Pinckney v. United States*, 352 F.2d at 70. Second, such summarization must avoid in any way an invasion of the province of the jury to determine the facts of the case. *State v. Holland*, 122 R.I. at 347, 405 A.2d at 1216; *State v. Harris*, 89 R.I. at 209, 152 A.2d at 110. The trial justice may not summarize only direct testimony if the testimony on cross-examination is also pertinent to the determination of the issue that is the subject of the request.

This court has often held that the right to cross-examination is guaranteed by the confrontation clause of the Sixth Amendment to the Constitution of the United States. *State v. DeBarros*, R.I., 441 A.2d 549, 552 (1982); *State v. Anthony*, R.I., 422 A.2d 921 (1980); *see also Springer v. United States*, 388 A.2d 846, 854 (D.C.1978). Such a right is seriously diluted in the event that in response to jurors' requests for information regarding testimony, only the direct examination is summarized and the cross-examination is omitted. In the case at bar the answers elicited from Felber on cross-examination at least arguably might have had the effect of diminishing the apparent precision of the testimony given on direct examination. A careful scrutiny of the answers given by Felber on cross-examination might have led a juror to determine that the fire could have occurred somewhat later than at the time indicated in Felber's opinion on direct examination. Moreover, Felber's testimony disclosed on cross-examination that his knowledge of the structure and the contents of the building was very limited at the time he formulated his opinion regarding the time of commencement of the fire.[1] In sum, the importance of the testimony involved made the summary by the trial justice of only direct testimony inadequate and potentially misleading to the jurors. We note that although summary of testimony in response to jurors' questions may be appropriate in some cases, and that such summarization is done at the discretion of the trial justice, we are of the opinion that in the case at bar summary of Felber's cross-examination testimony would not have been feasible. The only proper response in this case would have been for the trial justice to order the court reporter to read to the jury those portions of Felber's direct and cross-examination testimony relating to the subject matter of the question.

The fact that the foreman of the jury agreed that this summary was satisfactory does not dispose of the issue. It does not frequently occur that jurors will express a disagreement with the trial jus-

---

1. Excerpts from the pertinent cross-examination are as follows:

"Q. When did you first determine it was burning a half hour, approximately?

"A. When the roof went in about 1:00, I put it all together, and the time element to burn through the roof, you're burning through two sets of floor joists—

"MR. McKINNON: Sir—

"THE COURT: Let him finish. Don't interrupt.

"A. So, you have to burn through the ceiling floor joists, the roof floor joists, the attic section, and some of these older buildings probably have space boarding on the roof. You have to go through the shingles and everything else. The time element for that to go in would be about a half hour to forty-five minutes.

    \*    \*    \*    \*    \*    \*

"Q. Now, sir, at 1:00 in the morning of July 10th when you first came to the opinion that the building was burning a half hour, did you know it had hardwood flooring at that time?

"A. I had no idea what was in that building until after they made the investigation. Then I determined what was in the building. I had never been in that building in my life.

"Q. Isn't it fair then, sir, to say that your opinion, which you just rendered as to the time that building was burning, was not based at all on the facts in the hypothetical that Mr. Nystedt asked you, but was based upon an opinion you, in fact, formulated at 1:00 on July 10th?

"A. Yes, it was.

    \*    \*    \*    \*    \*    \*

"Q. Is it fair to say, sir, that there exists a possibility within a reasonable degree of certainty, based upon your expertise, that that fire could have been smoldering longer than that half hour period of time?

    \*    \*    \*    \*    \*    \*

"A. It could, yes."

tice. Indeed, the acquiescence of the foreman may indicate that the trial justice's neat summary of the evidence elicited by the prosecution resolved a difficult question of fact with which the jurors had been encountering severe problems. However convenient this may be, it is the function of the jury to wrestle with such questions of fact rather than to have the question resolved by the trial justice who is generally looked upon with awe by the jurors and whose opinions, if given on questions of fact as well as of law, will enormously influence them.

We therefore conclude that under the circumstances of this case the summary of the direct testimony given by the trial justice constituted prejudicial error requiring a new trial.

## II

DID THE TRIAL JUSTICE ERR IN ADMITTING A STATEMENT MADE BY JACQUELINE PREFONTAINE TO RONALD DAME, ACCUSING HIM OF SETTING FIRE TO HER HOME?

At trial, three witnesses, Prefontaine, O'Connor, and Henry Gagne, a neighbor, testified regarding statements made by Prefontaine on the morning of the fire. Although these witnesses are not unanimous in their reports of the actual words used, they were in substantial agreement that upon seeing her home ablaze, Prefontaine screamed either "You set my house on fire" or "He set my house on fire." This statement was apparently directed at Dame, whom Prefontaine saw outside the burning building. Over the objection of defense counsel, the trial justice admitted that statement into evidence by declaring it to be "part of the flow of events." Although the trial justice attempted to limit the jurors' use of the statement by cautioning them not to use it as partial proof of the state's case, we find that the statement apparently admitted by the trial justice as part of the res gestae does not come within any recognized exception to the hearsay

rule, and therefore its admission into evidence was error.

We observe that historically the term *"res gestae"* was used to refer to the declarations and happenings that were part of an entire "transaction." 6 Wigmore, *Evidence* §§ 1757, 1767 (Chadbourn rev. 1976). The term was used to admit into evidence statements that either were not hearsay, or were hearsay and fit within a recognized exception to the hearsay rule. *State v. Vaccaro,* 111 R.I. 59, 62 n. 1, 298 A.2d 788, 790 n. 1 (1973). Although some of the recognized exceptions to the hearsay rule— spontaneous utterance, verbal acts, statements of mental condition, statements of bodily condition, present sense impression—probably existed prior to the common usage of the term *res gestae,* courts and practitioners alike came to use the term with great frequency. 6 Wigmore, § 1768. Its usage expanded to include hearsay declarations that did not fit within any recognized exception to the hearsay rule and, as with any catchall phrase, its use allowed those involved to "avoid the toilsome exertion of exact analysis and precise thinking." Morgan, *A Suggested Classification of Utterances Admissible as Res Gestae,* 31 Yale L.J. 229, 229 (1922); 6 Wigmore, §§ 1757, 1767.

■■■■■　More recently, the trend has been to avoid use of the "bewilder[ing] and perplex[ing]" phrase, *res gestae,* in favor of a more exacting analysis of the hearsay exception under which a declaration is being admitted into evidence. Morgan, 31 Yale L.J. at 229. Indeed, this court in *State v. Vaccaro* stated a preference for "more precise analysis and terminology in decisions related to the admissibility of evidence * * *." 111 R.I. at 62 n. 1, 298 A.2d at 790 n. 1. In *Vaccaro* we thereby followed the suggestion that "[t]he ancient phrase [*res gestae* ] * * * be jetisoned, with due acknowledgment that it has served well its era in the evolution of evidence law." *Id.* (quoting *McCormick's Handbook of the Law of Evidence* § 288 at 687 (Cleary 2d ed. 1972)). In light of the fore-

going principles, and applying them to the case at bar, we conclude that it is incumbent upon a trial justice precisely to set forth the recognized hearsay exception under which a declaration is being admitted. Here, the trial justice's use of the term "flow of events" does not meet this requirement. Thus, the admission of Prefontaine's statement was error.

We observe further that even if the trial justice had labeled Prefontaine's statement an excited utterance, its admission into evidence would still have been barred. This court has often held that an extrajudicial statement that is being offered to prove the truth of the matter asserted[2] is hearsay and therefore is inadmissible unless it fits within a recognized exception to the hearsay rule. *State v. Santos,* 122 R.I. 799, 820, 413 A.2d 58, 70 (1980); *Manuel J. Furtado, Inc. v. Sarkas,* 118 R.I. 218, 224–25, 373 A.2d 169, 172 (1977); *State v. Clark,* 112 R.I. 270, 274, 308 A.2d 792, 794–95 (1973). *See* Fed.R. Evid. 801(c); 6 Wigmore, § 1766. As an exception to the hearsay rule, which has often been recognized by this court, a spontaneous utterance is a statement made in the excitement of the moment so that the declarant had little or no time to reflect upon its substance. As such, the statement is considered to be a "sincere, truthful response to the actual sensations and perceptions produced by the preceding external shock." *State v. Jalette,* 119 R.I. 614, 619, 382 A.2d 526, 529 (1978); *see State v. Poulin,* R.I., 415 A.2d 1307, 1310–11 (1980); *see also* Fed.R.Evid. 803(2); 6 Wigmore, § 1747. As an additional element, this court in *In re Kim* noted that as a threshold requirement of reliability of the excited utterance, the declarant must have had firsthand knowledge of the event to which the utterance pertains. R.I., 445 A.2d 295, 296 (1982). We stated in *Kim* that "[e]xcitement alone, without the opportunity to observe, cannot meet the essential test of reliability." *Id.* 445 A.2d at 297; 6 Wigmore § 1751 ("the declarant must appear to have had *an opportunity to observe personally* the matter of which he speaks").

Here, it is undisputed that Prefontaine was not in a position to observe Dame setting fire to the house. By the time Prefontaine and O'Connor had returned to Prefontaine's home, the fire was well under way and Dame was outside the building. Without firsthand knowledge that Dame had set fire to her home, Prefontaine's statement does not meet the test recognized as essential by this court in *Kim. In re Kim,* 445 A.2d at 296–97. Therefore, Prefontaine's statement is inadmissible as an excited utterance.

The state argues that Prefontaine's accusation, together with Dame's response, constitutes an adoptive admission that would make the declaration admissible as part of the context of the response. The short answer to this argument is that the trial justice did not consider the admissibility of this statement as an adoptive admission but, as previously indicated, relied upon *res gestae* grounds that were inapplicable. This court has in numerous cases considered the doctrines relating to adoptive admissions, most recently in *State v. Pacheco,* R.I., 481 A.2d 1009, 1014–15 (1984). In *State v. Lerner,* 112 R.I. 62, 83–84, 308 A.2d 324, 338 (1973), we set out five factors that a trial justice should consider in ruling on the admissibility of such statements:

"(1) [whether] the statement was incriminating or accusatory;

"(2) that it was one to which an innocent person in the situation of the defendant would reply;

"(3) that it was made within the presence and hearing of the defendant;

"(4) that he understood the meaning of the statement; and

---

**2.** The Prefontaine accusation could have no effect upon the jurors other than tending to prove the matter asserted.

"(5) that he had an opportunity to deny or reply to the statement." *Id.* at 84, 308 A.2d at 338.

In *Pacheco* and *Lerner* we were considering a situation in which the defendant made no reply at all. We do not suggest that the admissibility of an adoptive admission should depend solely upon the silence of the accused. Naturally, other responses may be considered in determining whether a defendant has in effect admitted either all or one or more elements of the offenses with which he is charged.

▌ We are of the opinion that since a new trial is required in this case as a result of the first issue considered, it would be preferable to permit the trial justice to consider the admissibility *vel non* of the Prefontaine accusation together with Dame's response as an adoptive admission rather than for this court to consider it when raised for the first time on appeal.

## III

DID THE TRIAL JUSTICE ERR IN ALLOWING THE MEDICAL EXAMINER TO TESTIFY CONCERNING HIS OPINION OF THE CAUSE OF DEATH BASED IN PART ON TOXICOLOGICAL TESTS PERFORMED BY A THIRD PARTY?

▌ Doctor Arthur Burns (Burns), the State Medical Examiner, gave his opinion regarding the cause of death and relied in part upon a level of carbon monoxide in the victim's blood disclosed by toxicological tests performed by a technician at the Rhode Island Department of Health laboratory. Burns had examined the body externally and was aware of the circumstances preceding the victim's death. He had not, however, performed an autopsy. In allowing an expert witness to testify concerning a diagnosis, this court has drawn a distinction between the treating physician and a forensic expert called only to give an opinion at the trial of a case. Generally, the treating physician is allowed to rely upon the results of tests performed by others when giving opinion testimony concerning a diagnosis, *Rosaki v. School House Candy Co.*, 122 R.I. 51, 404 A.2d 75 (1979), whereas a forensic expert called only for purposes of trial may not. *Young v. New England Transportation Co.*, 97 R.I. 499, 199 A.2d 300 (1964). The Federal Rules of Evidence make no such distinction. *See* Fed.R.Evid. 703.

▌ We are of the opinion that a medical examiner, although often called as a forensic expert, bears more similarity to a treating physician than he does to one who is merely rendering an opinion for use in the trial of a case. An important function performed by the medical examiner is the determination of the cause and manner of death in cases of persons who died by violence or from other causes enumerated in G.L.1956 (1979 Reenactment) § 23–4–7, as part of his official duties whether or not a judicial inquiry may ensue. At the time that he performs this function, he makes a determination that may never require testimony but which in some instances will form the basis for action by other state officials. We believe that the medical examiner should not be required to close his eyes to sources of information relied upon by mankind generally in order to determine the questions that must be resolved in his official capacity. *See Sundquist v. Madison Railways Co.*, 197 Wis. 83, 87, 221 N.W. 392, 393 (1928); Rheingold, *The Basis of Medical Testimony*, 15 Vand.L.Rev. 473, 508 (1962). In allowing the medical examiner to rely upon toxicological reports from the Department of Health, the trial justice committed no error.

## IV

SHOULD DEFENDANT'S CONVICTION BE REVERSED BECAUSE OF FAILURE OF THE STATE TO MAKE DISCOVERY IN ACCORDANCE WITH RULE 16 OF THE SUPERIOR COURT RULES OF CRIMINAL PROCEDURE?

▌ The defendant argues strenuously that in a number of instances the state

failed to make discovery fully and adequately in accordance with Rule 16 of the Rules of Criminal Procedure of the Superior Court. In light of our determination that a new trial is required in this case on other grounds, we are of the opinion that the discovery issues have been rendered moot. The defendant has certainly now been given all of the information earlier requested and has had the benefit of hearing the testimony of the state's witnesses at the trial. Consequently, at the new trial that has been ordered, the defendant will be in possession of all the information and documents of whose absence or inadequacies he now complains. Therefore, it is unnecessary to deal with this issue on its merits.

For the reasons stated, the appeal of the defendant is sustained in part. The judgment of conviction is hereby vacated. The papers in the case may be remanded to the Superior Court for a new trial.