249 A.2d 48.

JOHN MORGAN *et ux. vs.* WASHINGTON TRUST COMPANY.

JANUARY 10, 1969.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

14

KELLEHER, J. This is a negligence action brought by a husband and wife for injuries received by the wife in a fall on stairs leading into a branch bank operated by the defendant. The case was tried before a justice of the superior court sitting with a jury. The jury awarded the wife the sum of $9,000 and returned a verdict on the husband's claim for consequential damages in the amount of $2,500. The trial justice denied the defendant's motion for a new trial. In its appeal, the defendant challenges the correctness of several of the trial justice's evidentiary rulings and certain portions of his charge to the jury. It also claims that its motion for a new trial should have been granted. Although we shall limit our discussion to the wife's phase of the instant claim, what we say shall be dispositive of the husband's interest in this proceeding.

The defendant is a banking corporation duly organized pursuant to the laws of Rhode Island. Its main place of

business is located in Westerly. It also maintains a branch bank in the Hope Valley section of Hopkinton. The building that houses defendant's operation at one time also contained other commercial endeavors, including a grocery store and a plumbing shop. Over the years, defendant's Hope Valley business increased to such an extent that it had to take over certain portions of the building previously occupied for non-banking endeavors. Accordingly, in late 1962 or early 1963, defendant undertook an extensive renovation project at its branch office. A complete face-lifting of the exterior of the front of the Hope Valley facility was accomplished. The bank's entrance was refurbished. The old wooden doors which had swung inward were replaced by two sets of aluminum and glass doors which in accordance with accepted safety standards opened outward. Each set consisted of two doors—hereafter we shall refer to the sets as the outer set and the inner set.

At the completion of the renovations, a patron seeking entrance into the bank would walk up three steps to a small landing, cross over it to the outer set of two doors, each door being 30 inches wide, pull one of the doors toward him, step up about nine inches into a vestibule, walk through the vestibule to an inner set of doors which also required a similar pull, open one of the doors and advance into the main portion of the bank where tellers have serviced the needs of the economy-minded residents of this area for more than a quarter of a century.

The plaintiffs are residents of Hopkinton and have maintained a savings account at defendant's branch for many years—both before and after the overhaul of the premises. April 21, 1965 was "a beautiful day" and shortly before noon, Mrs. Morgan, a woman of short stature and slight build, drove to the bank. She parked her car and ascended the three steps at the entrance of the bank, crossed over the landing and reached for the handle which extended down-

ward from the door. What then transpired is best de-
scribed by quoting the following portion of her testimony:

"I put up my hand on the handle to pull the door and
it seemed rather hard to pull and all of a sudden it
flipped open and I flipped back, and I flipped back on
my back on the curbstone with my head on the curb."

The plaintiff wife was assisted into the bank where the
branch manager ministered to her needs. She then drove
home and consulted a local physician. Sometime later in
the afternoon, Mrs. Morgan was admitted to the South
County Hospital where she remained for a period of about
$2\frac{1}{2}$ weeks. The day after her admittance, a series of x rays
were taken of plaintiff's back. The hospital records cover-
ing this period of plaintiff's treatment contained a final
diagnosis which described her injuries as being multiple
contusions of the entire body.

After her discharge from the hospital, Mrs. Morgan con-
tinued to be treated by her physician. She returned to the
South County Hospital on two subsequent occasions. In
September 1965 she was a patient there for three weeks.
Later, in May 1966, she spent two weeks at this institution.
The hospital records covering these two periods of treat-
ment contained a final diagnosis that plaintiff's complaint
was osteoarthritis of the cervical and thoracic spine.

The trial in the superior court took on the air of a battle
of experts. The doctor who treated plaintiff stated that
as a result of the April 21 incident his patient suffered a
narrowing of the fifth lumbosacral space. He also stated
that the pain which forced the last two stays at the hos-
pital was due to a quiescent arthritic condition which had
been ignited by her fall. An architect who testified for
plaintiff stated that in his opinion the design and construc-
tion of the bank's entranceway was defective in three sep-
arate and distinct respects. The defendant fielded a group
of experts in the fields of building design and the medical

sciences. Their testimony differed from that offered by plaintiff's witnesses.

While defendant contends that the trial justice committed numerous errors, it is our considered judgment that we should limit ourselves to a consideration of only two aspects of its appeal.

## I

### The Testimony of Plaintiff's Architect

The defendant asserts the testimony offered by the architect on behalf of plaintiff should not have been allowed into evidence. His argument is two-fold. First, he states generally that there was no need for expert testimony as to the physical makeup of defendant bank's entranceway because this matter was readily within the grasp of men of ordinary intelligence. He also urges that we invalidate a certain portion of the expert's opinion because it was based upon a supposition which had no factual basis in the evidence. For the reasons that follow we can find no merit in this phase of defendant's appeal.

Generally, all matters of opinion are excluded from evidence as being unreliable. *Fontaine* v. *Follett,* 51 R. I. 413, 155 A. 363; *Latham* v. *Latham,* R. I., 133 A. 241. The primary objective of any trial is to educe evidence which is rigidly based on fact, and thereafter to submit this evidence to the jury's deliberation in the expectation that their verdict will be founded upon truth. To needlessly permit speculative or opinion testimony to come before the jury for its consideration is to disregard the discipline of truth and to condone the possibility that non-objective statements might form the basis for the jury's verdict.

Expert testimony, on the other hand, involves an exception to the general rule excluding opinions. The rule, long established in this and other states, is that where the subject matter of the testimony is of a mechanical, scientific, professional or like nature, none of which is within the

**18**

understanding of laymen of ordinary intelligence, and where the witness seeking to testify possesses special knowledge, skill or information about the subject matter acquired by study, observation, practice or experience, then such an individual's opinion may be heard as an aid to the jury in its quest to discover the truth. See 2 Wigmore, (3d ed.) *Evidence*, §§555-563. The decision to include or exclude proposed expert testimony rests with the sound discretion of the trial justice. In reaching it, he must give consideration to the natural tendency of jurors to place greater weight on the testimony of one qualified as an expert. His decision must reflect his belief that the value to be derived from the proposed testimony in terms of aiding the jury in its search for the truth justifies the admission of the opinion evidence.

From the pictures which are in evidence, the entranceway to defendant's bank appears to the untutored eye to be perfectly safe. It is only when a trained individual such as plaintiff's architect compares the outward swing of the new doors with the depth of the platform, and when he explains the difficulty encountered by a person of short stature in reaching up and pulling open the door that the hazards that may surround entry into the bank become apparent. The trial justice was correct in allowing the jury to hear plaintiff's architect.

The defendant takes umbrage to that portion of the expert's opinion wherein he stated that the presence of weatherstripping on the inner set of doors permitted the creation of a vacuum within the vestibule that made it difficult for Mrs. Morgan to open the outer door. He points out that this witness's opinion was based on the assumption that the bank's inner doors were closed at the time plaintiff wife pulled on the outer door, but that there was no evidence to show that the inner doors were in fact closed on this beautiful April day. We agree with defendant that

this was a conclusion premised upon fact that was not present in the evidence. *Oliver* v. *Pettaconsett Constr. Co.*, 36 R. I. 477, 90 A. 764; *Eastman* v. *Dunn*, 34 R. I. 416, 83 A. 1057. Nevertheless, we feel that the jury's decision as to defendant's negligence must stand for another reason.

. At the trial, plaintiff developed two separate theories of negligence in addition to the vacuum-build-up theory which defendant bank complains of. The architect testified that safety-oriented architectural standards would require that the platform or landing at the top of the step should have extended at least 36 inches beyond the outward-most extent of the outer door when open. In fact, it extended only ten inches beyond the fully opened doors, which were described as "stock doors." The same witness also stated that the handle on the doors should have been placed lower to compensate for the nine-inch step over which the doors were installed. It is because this case went to the jury upon diverse theories of negligence that we feel that we cannot now disturb the verdict.

Here, there was no request by defendant bank that the jury make any special finding as to plaintiff's specific allegations of negligence. Thus, since the verdict was general, we have now no way of knowing in what respect the jury deemed defendant to be negligent. Unquestionably, there was competent evidence introduced by plaintiff to support two of her three theories of negligence. It is well settled that where the verdict is general under circumstances such as are present here, that verdict must be allowed to stand. See *Pelletier Constr. Co.* v. *Trullis*, 70 R. I. 121, 37 A.2d 369; *Lucas* v. *South Norwalk Trust Co.*, 121 Conn. 201, 184 A. 157; *Roberts* v. *Del Monte Properties Co.*, 111 Cal. App.2d 69, 243 P.2d 914. We endorse the trial justice's ruling on defendant's motion for a new trial where in his independent review of the evidence he found that the plat-

form was of insufficient depth and the door handles improperly placed.

## II
### The Testimony of Plaintiff's Physician

A large portion of defendant's appeal is directed to certain rulings made by the trial justice relating to the testimony offered by the wife's physician. The defendant contends that this witness, a general practitioner, should not have been permitted to interpret the x ray film taken of his patient during her first period of treatment at the hospital in April 1965. It also argues with special vigor that the superior court should have permitted defendant to show that this doctor had made a statement which was inconsistent with his courtroom testimony.

When defendant first registered its objection to the doctor's interpreting the April 22 films, the witness told the trial judge that he had been performing this function since he was first licensed to practice medicine—32 years before. Although he acknowledged that he might experience difficulty in analyzing some types of film showing the intestinal tract, the witness assured the court that he could interpret the x ray plates which are exhibits here. At this juncture of his testimony, the doctor had recited a detailed and rather extensive review of his experience and training. On innumerable occasions we have held that the qualifications of an expert witness is a question directed to the sound discretion of the trial justice. See *Redding* v. *Picard Motor Sales, Inc.*, 102 R. I. 239, 229 A.2d 762. On review of the witness's testimony we can perceive no indication that the trial court abused his discretion in allowing this physician to give the jury his interpretation of the results of plaintiff's x rays. The fact that the witness was not a specialist in the field of radiology goes only to the weight and not the admissibility of the doctor's testimony.

We now turn to defendant's contention that the trial

court erred in prohibiting defendant from showing that plaintiff's physician had made an out-of-court statement that was inconsistent with his courtroom testimony.

It is readily apparent from a review of the record that the largest portion of plaintiff's claim for damages stems from the pain, discomfort and expense that she underwent because her fall allegedly ignited a previously dormant arthritic condition. In testifying as to this phase of his patient's complaint, the physician testified from hospital records which refer to plaintiff's last two hospitalizations and which bear his signature. The records described the patient's ailment as: Osteoarthritis of the cervical and thoracic spine.

When the suit was in its pleading stage, defendant in August 1966 asked plaintiff wife by way of interrogatories if she had ever made a claim for benefits under any accident and health policy for the injuries allegedly sustained in her fall. It also asked Mrs. Morgan to furnish the name of the insurer. Thereafter, on September 13, 1966, plaintiff replied that she had made a claim against an insurance company having its main offices in Chicago. This suit was reached for trial in Westerly on May 19, 1967. On this date a subpoena duces tecum was served by defendant upon the state insurance commissioner commanding the wife's insurer to produce in court its entire record of plaintiff's claim.[1] While a copy of the subpoena was making its way westward to Chicago, plaintiff presented her testimony.

On May 25, 1967, the attending physician testified and he attributed the pain which hospitalized plaintiff in Sep-

---

[1]G. L. 1956, §27-2-13, provides that the insurance commissioner shall be the attorney for service of all "lawful process" issued against any foreign insurer doing business in Rhode Island. In serving the subpoena on the commissioner, defendant maintains that the term "lawful process" embraces within its meaning witness subpoenas and subpoenas duces tecum. It is our belief that this question is not germane to the instant appeal and we make no determination as to the applicability of this legislation.

tember 1965 and May 1966 to the fall on defendant's stairs. Shortly after this witness left the stand, plaintiff rested her case and defendant began its presentation of evidence.

On Monday, May 29, 1967, defendant placed on the stand a representative of Mrs. Morgan's health and accident insurer. He had come, in response to the subpoena served on the insurance commissioner, and brought with him his employer's entire file on Mrs. Morgan's claim. Included in the insurer's records was a letter dated December 20, 1965, and sent by it to plaintiff's physician. In the letter, the insurer related that their insured, Mrs. Morgan, had informed it that she felt her cervical arthritis was related to her injury of April 21, 1965. The insurer then stated that in its view Mrs. Morgan's attack of arthritis was an entirely new condition and had no connection with the episode on defendant's stairs. The doctor was asked for his comment on the controversy brewing between his patient and the insurer. The physician wrote the following notation on the bottom of the letter:

"In my opinion, the arthritis has nothing to do with the injury of April 21, 1965."

He then added his signature and mailed the letter back to the insurer.

After the entire letter was made an exhibit for identification, the wife's doctor returned to the stand. He conceded that the signature and the handwriting at the bottom of the insurer's letter were his. He admitted receiving the communication and said he replied to it as we have set forth his statement above.

The defendant thereupon launched a lengthy and persistent attempt to impeach the doctor's earlier testimony by interrogating him about the report he furnished to plaintiff's insurer. The defendant was unsuccessful because the trial justice would not permit any cross-examination of the witness as to the opinion he had expressed to the in-

surer, nor would he allow defendant to lay a foundation through the use of the letter for the purpose of impeaching the doctor's at-trial opinion. In making this ruling, the court observed that there was no inconsistency between the witness's prior testimony and his written statement to the insurer. The trial justice sustained several of plaintiff's objections to certain inquiries made by defendant declaring that at this point in the trial, the physician was defendant's witness and that the defense could not impeach its own witness.

The logical point of departure in reviewing the merits of defendant's contention that he should have been allowed to examine the doctor concerning his prior inconsistent statement is, of course, to initially determine whether or not the proposed testimony would achieve the significance that defendant attaches to it. In other words, was the physician's report rendered to plaintiff's insurer in December 1965 inconsistent with his testimony of May 25, 1967? In moving toward this legal conclusion we must be guided by reference to proper standards as to what constitutes an inconsistent statement. In this respect we find that there are certain requisites which the proffered impeachment evidence must satisfy.

We feel that any alleged inconsistency should be determined not on the basis of a single isolated answer but from the witness's testimony as a whole. *Commonwealth* v. *West,* 312 Mass. 438, 45 N.E.2d 260; *Zuber* v. *Northern Pacific Ry.,* 246 Minn. 157, 74 N.W.2d 641. See also 3 Wigmore, (3d ed.) *Evidence,* §1040, at 725. The task for the trial court when such evidence is sought to be introduced is to compare the two utterances. Are they inconsistent? Do the two expressions appear to have been produced by inconsistent beliefs? See Wigmore, *supra,* at 725-726. McCormick in his text urges that the test in determining inconsistency should be whether the jury could reasonably

find that a witness who believed the truth of the facts testified to would have been unlikely to make the prior statement. See McCormick, *Evidence,* chap. 5, sec. 34, p. 64.

Being cognizant of the above-stated principles of law, we have carefully scrutinized the transcript to determine the effect of the doctor's testimony. In doing so, we find three separate instances where the relationship is mentioned between the fall in April and the later diagnosis and treatment for osteoarthritis of the cervical spine and thoracic arthritis. Shortly after the cross-examination of the doctor began, he was asked to read from his office record concerning certain entries thereon. The record listed in chronological order the symptoms, diagnosis and treatment of Mrs. Morgan inclusive of all the hospitalizations which plaintiff claimed were related to her fall. The concluding sentence of that report which pertained to a time after plaintiff's third hospitalization was read to the jury as follows:

> "Osteoarthritis cervical and thoracic spine as a result of fall in April, '65."

This record is an exhibit in the case.

On redirect examination the doctor was asked the following question:

> "Q How do you connect the osteoarthritis with the injury received in the accident, doctor?
>
> "A The only thing I can say about that is that any arthritic condition, irrespective of whether it is rheumatoid arthritis, osteoarthritis or any other specific type of arthritis, that any trauma can exaggerate the condition. Where they might not have had trouble before with their arthritic condition, the trauma intensifies the condition and now they begin to complain."

During the physician's second appearance on the witness stand, defense counsel asked:

> "Q Doctor, do you have an opinion as to the relationship between the osteoarthritis of the cervical and

thoracic spine and the fall which she sustained at the Hope Valley branch of the Washington Trust Company in April of 1965?

\* \* \*

"A  Yes, I have an opinion.

"Q  What is your opinion?

"A  My opinion is that any underlying osteoarthritis or any type of arthritis, whether it is osteoarthritis or rheumatoid arthritis or any other type, an injury will aggravate the underlying condition and in my opinion the injury did aggravate the underlying condition.

"Q  Has that always been your opinion, doctor?

"A  That's my opinion.

"Q  Has that always been your opinion?

"A  Yes."

In reading these statements and comparing their meaning with the report made by the doctor in the December 20 letter, it is clear that an inconsistency exists. The effect of the doctor's testimony both by inference and direct statement indicated that in his opinion plaintiff's arthritic pains and the accompanying periods of disability were related to her fall. We must conclude, therefore, that the observation of the trial justice that the doctor's written report was not at variance with the physician's courtroom utterances finds no support in the evidence.

When the doctor reappeared at the trial, it was in response to a subpoena duces tecum. The same had been issued by defendant on the previous Friday, the day after the doctor had testified on behalf of plaintiff. Its purpose was to compel the production of certain medical records pertaining to Mrs. Morgan which the doctor had not made available at his prior appearance. It was only after the issuance of the subpoena, and in fact not until the day that the doctor reappeared, that defendant learned of the physician's statement made to Mrs. Morgan's out-of-state insurance carrier.

When the doctor returned to the witness stand, he was briefly questioned as to the records he had with him. The defendant then asked the court to consider this present line of inquiry as a continuation of his original cross-examination. In making this request, counsel stated that he had become aware of the doctor's statement that very morning and since it related to matters testified to by the witness on direct examination, he appealed to the court's discretion to allow him to proceed. The court replied that defendant had summoned the doctor as his own witness and noted that since defendant had not at any time during plaintiff's case requested the right to recall the doctor for further cross-examiation, orderly trial procedure required that defendant be foreclosed from doing so at this point. While we are well aware that the conduct and extent of cross-examination rests largely within the discretion of the trial justice, this court does review the exercise of this discretion to determine if it satisfies standards which we have heretofore enunciated.

We pointed out in *Atlantic Refining Co.* v. *Director of Public Works,* 102 R. I. 696, 233 A.2d 423, that a ruling which involves the trial court's discretion will be sustained if the discretion has been soundly exercised, that is, it has been exercised not arbitrarily or wilfully but with a regard to what is right and equitable under the circumstances and the law. In our opinion, the trial justice's refusal to allow defendant to cross-examine the doctor for the purposes of impeaching his earlier testimony does not meet these standards.

The primary goal of any trial is the ascertainment of truth. Clearly, the jury as the primary fact finder in the search for truth should be afforded every opportunity to meaningfully perform its function. The procedural rules which govern the conduct of a trial are adopted to facilitate this objective rather than hinder it. In invoking them, the

trial court must never lose sight of the purpose toward which all the activities of the trial are directed. It is only after the jury has determined where the truth lies that the law can distribute its justice.

In his treatise on the law of evidence, Wigmore has assessed the value of the right to cross-examine under our system of jurisprudence. In speaking of the necessity of this "distinctive" right he describes cross-examination as being "the greatest legal engine ever invented for the discovery of truth." 5 Wigmore, (3d ed.) *Evidence*, §1367, at 28-29.

By not permitting the doctor's testimony to be tested before the jury by a comparison with his prior statement, inconsistent as it is, the trial court inadvertently impaired the ability of the jury to correctly determine the extent of damage plaintiff sustained as the result of her tumble down the stairs. We say this in the belief of defense counsel's uncontradicted representations to the superior court that he did not and could not obtain the information in the December 20 letter until sometime after the physician had concluded his testimony on the prior Thursday.

We believe that the ends of justice would be best served by remitting this case to the superior court for a new trial solely on the question of damages.

The defendant's appeal is sustained in part and overruled in part and that portion of each judgment entered herein awarding damages is vacated and the case is remanded to the superior court for further proceedings in accordance with this opinion.

*Natale L. Urso, John J. Adamo,* for plaintiffs.

*Raymond A. LaFazia, John F. McDonough,* for defendant.